UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
MEI YANG KO,

                            Appellant,

                                                    **MEMORANDUM & ORDER**
              - against -                                20-CV-2866 (PKC)

GREGORY MESSER, as Chapter 11 Trustee of
41-23 Haight Street Realty, Inc.,

                            Appellee.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

       Appellant Mei Yang Ko appeals an order of the United States Bankruptcy Court for the

Eastern District of New York, the Honorable Nancy Hershey Lord presiding.  Over Appellant Ko's

objection, the Bankruptcy Court granted the motion of Appellee Gregory Messer—Chapter 11

Trustee of the Debtor 41-23 Haight Street Realty, Inc.'s estate—to retain deposits paid in

connection with a contemplated sale of certain real properties of the Debtor.  For the reasons below,

the Bankruptcy Court's order with respect to Appellant Ko is affirmed.[1]

## BACKGROUND

       On June 4, 2019, several creditors filed an involuntary petition under Chapter 11 of the

Bankruptcy Code against the Debtor in the Bankruptcy Court.  (R. 3.)[2]  By order of the Bankruptcy

Court on August 12, 2019, Appellee was appointed the Chapter 11 Trustee of the Debtor's estate

("Appellee-Trustee").  (R. 6.)  On December 12, 2019, the Bankruptcy Court approved the

---

    [1]  A companion appeal of the Bankruptcy Court's order brought by another objecting party, Liang Xiang Xu, is also before this Court.  *See Xu v. Messer*, Case No. 20-CV-3215 (PKC).  Xu's appeal raises different issues and is the subject of a separate decision.

    [2]  Citations to "R." refer to the consecutively paginated record transmitted from the Bankruptcy Court and filed electronically on the Court's CM/ECF docketing system at Dkt. 2.

retention of Maltz Auctions, Inc., d/b/a Maltz Auctions, and Rosewood Realty Group as co-brokers to sell the Debtor's real properties in Queens County (the "Real Property").  (R. 16.)  The Bankruptcy Court subsequently entered an order on March 30, 2020 (the "Sale Procedure Order"), that, among other things, authorized Appellee-Trustee to proceed with a virtual public auction sale of the Real Property, and approved the terms and conditions of sale ("Sale Terms") and the notice of sale.  (R. 20, 49–71.)  Notably, under the Sale Terms, any purchaser is generally required to make an initial deposit ("Deposit"), pay a 4% buyer's premium "within 48 hours after conclusion of the Sale" ("Buyer's Premium"), and "close title to the Real Property at a date that is no more than thirty (30) days after the Sale Date (the 'Closing Date')," although such Closing Date may, at the "sole discretion" of Appellee-Trustee, be extended by 30 days.  (*See* R. 57–58 (formatting in original).)  The Sale Terms also state—in bold, underlined font—that

> **TIME IS OF THE ESSENCE against [any purchaser] and the failure of [any purchaser] to close for any reason whatsoever (except as otherwise provided herein) including its failure to pay the balance of the Purchase Price on the Closing Date, will result in an immediate forfeiture of the Deposit and Buyer's Premium and the termination of such [purchaser's] right to acquire each Real Property under these [Sale Terms] and the Memorandum of Sale.**

(R. 59 (formatting in original).)

On April 9, 2020, the Bankruptcy Court approved an agreement that Appellee-Trustee had entered into with Tu Kang, business partner of Wing Fung Chau a/k/a Andy Chau, and Selena Chau, daughter of Andy Chau (collectively, the "Initial Offerors"), for purchase of the Real Property at a price of $31,000,000.  (R. 21, 122–23.)  After the Bankruptcy Court approved the agreement, however, the Initial Offerors defaulted.  (R. 123.)

 Following the default of the Initial Offerors, Appellee-Trustee received an offer from Appellant Ko and Liang Xiang Xu for purchase of the Real Property at a price of $27,300,000.  (*See* R. 72–75.)  This offer was reduced to a signed written agreement dated April 20, 2020 (the

"Stalking Horse Agreement"), which incorporated the previously approved Sale Terms and provided that a Deposit of $2,780,000 would be paid to Appellee-Trustee.  (R. 85–86; *see also* R. 87–93 (Sale Terms annexed to the Stalking Horse Agreement).)  Thereafter, Appellee-Trustee received a series of checks amounting to the full Deposit of $2,780,000.  (R. 75, 82.)

On April 29, 2020, Appellee-Trustee moved the Bankruptcy Court for an order approving the Stalking Horse Agreement.  (R. 23, 72–84.)  The Bankruptcy Court held a telephone hearing on May 5, 2020, during which counsel for Appellant Ko, Andy Choi, confirmed to the Bankruptcy Court that Xu had "pulled out" and Appellant Ko was prepared to proceed alone.  (*See* R. 24, 158–59, 165.)  The Bankruptcy Court also considered and overruled an objection by the Initial Offerors to approval of the Stalking Horse Agreement.  (*See* R. 170–88.)  Accordingly, on May 8, 2020, the Bankruptcy Court entered an order (the "Stalking Horse Order") approving the Stalking Horse Agreement and naming Ko as the "Stalking Horse Bidder."  (R. 24, 94–107.)

On May 12, 2020, at 11:00 a.m., the co-brokers held a virtual public auction, and "the Stalking Horse Bidder [*i.e.*, Ko] was the successful bidder of the Real Property with a bid of $27,300,000 *plus* the Buyer's Premium and the transfer tax (the 'Purchase Price')."  (R. 111.) Appellee-Trustee filed an affirmation the next day confirming the public auction sale of the Real Property.  (R. 24, 108.)

On May 14, 2020, the Bankruptcy Court held a hearing shortly after 11:00 a.m. to confirm the results of the sale.  (*See* R. 25, 219–20.)  During the hearing, counsel for Appellee-Trustee verified that the 4% Buyer's Premium had not yet been paid, despite the 48-hour deadline under the Sale Terms.  (R. 232.)  Appellant Ko's counsel, Choi, however, represented that his client was "in the process of" completing a wire transfer of the funds, noting that the funds were "coming from several wires" that were being gathered into "one single wire," and it was agreed that Ko

3

would have until the end of the day to wire the funds to cover the Buyer's Premium.  (*See* R. 232–34.)  The Bankruptcy Court explicitly warned Choi: "The terms have to be—as you know, the terms have to be complied with.  And if they're not complied with, there'll be a default declared.  They'll have to come before me.  And the deposit will end up [] with the estate."  (R. 233–34.)  Choi replied, "Okay," and "Yes, Your Honor."  (*Id.*)

On May 19, 2020, after the Buyer's Premium was timely remitted to Appellee-Trustee, the Bankruptcy Court entered an order (the "Sale Confirmation Order") confirming the sale of the Real Property to "the Stalking Horse Bidder," *i.e.*, Appellant Ko.  (R. 25, 144–54.)  Among other things, the Sale Confirmation Order found that Appellant Ko was "purchasing the Real Property in good faith" and was "a good faith buyer."  (R. 147.)  The Sale Confirmation Order—consistent with the Sale Terms—also ordered:

> The Stalking Horse Bidder [*i.e.*, Appellant Ko] shall close title to the Real Property no later than June 11, 2020 (which is no more than thirty (30) days after the date of the Public Auction) (the "Closing Date"), **TIME BEING OF THE ESSENCE**, although such Closing Date may be extended by the Trustee [*i.e.*, Appellee], in his sole discretion and after consultation with the Lender, but such extension of the Closing Date shall not be later than thirty (30) days from the original Closing Date—July 11, 2020, **TIME BEING OF THE ESSENCE**.

> To the extent that the Trustee, in his sole discretion, grants any such extension of the Closing Date, the Purchaser shall provide to the Trustee an additional, non-refundable deposit equal to ten (10%) percent of the Purchase Price in the amount of $2,730,000 (the "Additional Deposit").  The Additional Deposit shall be made by certified check or bank check made payable to "Gregory M. Messer, Chapter 11 Trustee" or by wire in immediately available federal funds.

> The Stalking Horse Bidder [*i.e.*, Appellant Ko] shall pay the Additional Deposit, and any other adjustments, as of the original Closing Date, and failure to do so shall be deemed a default under the terms of the Stalking Horse Agreement and the Sale Terms and shall result in the Stalking Horse Bidder's automatic forfeiture of any rights whatsoever to the Deposit, the Additional Deposit and the Buyer's Premium.

> . . .

> Time is of the essence as to the Purchaser's obligation to timely close on the Sale on the Closing Date and the failure of the Purchaser to close for any or no reason whatsoever, including, without limitation, its failure to pay the balance of the

4

> Purchase Price on the Closing Date, will result in an immediate forfeiture of the Deposit, any Additional Deposit, and Buyer's Premium and the termination of the right to acquire the Real Property.

(R. 150–52 (formatting in original).)

On June 9, 2020, two days before the original Closing Date, Appellant Ko—through her counsel, Choi—informed Appellee-Trustee that she was not prepared to close because of funding issues and requested a 30-day extension.  (R. 201, 339–40.)  Appellee-Trustee—also through counsel—advised that he would consent to the extension, provided that Ko: (i) execute an acknowledgement of terms with respect to the requested extension (the "Acknowledgement"); and (ii) deliver an Additional Deposit of $2,730,000, via wire transfer, by June 10, 2020.  (R. 201, 340; *see also* Brief of Appellee Gregory M. Messer ("Appellee Br."), Dkt. 7, at 13.)

Negotiations between counsel for the parties as to the terms of the Acknowledgement continued into the afternoon of June 10, 2020.  (*See* R. 201, 348–50.)  At 3:39 p.m., Appellant's counsel, Choi, informed Appellee-Trustee's counsel that the finalized Acknowledgement had been forwarded to Appellant Ko, and Choi had advised Ko "to commence with [the] wire as soon as possible," given the same-day deadline.  (R. 348.)  The Acknowledgement, among other things, provides:

> The Trustee has agreed to adjourn the Original Closing Date to the Outside Date. **TIME SHALL BE OF THE ESSENCE WITH REGARD TO PURCHASER'S OBLIGATION TO CLOSE ON THE SALE OF THE REAL PROPERTY ON THE OUTSIDE DATE**, on the conditions set forth herein including, without limitation, that I [*i.e.*, Appellant Ko], as Purchaser, agree to and deliver to Trustee [*i.e.*, Appellee] an additional deposit of $2,730,000 (the "<u>Additional Deposit</u>"), which will be tendered to the Trustee, via a wire transfer (instructions annexed hereto), today (June 10, 2020).  **TIME OF THE ESSENCE [*sic*] WITH REGARD TO PURCHASER'S OBLIGATION TO DELIVER THE ADDITIONAL DEPOSIT TO TRUSTEE ON SUCH DATE;**
>
> . . .
>
> If for any reason, or no reason at all, I, as Purchaser, fails or refuses [*sic*] to comply in all respects with (i) the terms and conditions of this agreement; (ii) the terms and

conditions of the Sale Confirmation Order; (iii) the Stalking Horse Agreement; or (iv) the [Sale Terms] then, in either of such events, an event of default by me, as Purchaser, shall exist and as a result thereof [] I shall forfeit its right to, and shall not be entitled to, purchase the Real Property from the Trustee; and I shall forfeit all rights in and to acquiring the Real Property from Trustee and shall forfeit all sums paid to the Trustee including without limitation the Deposit (defined herein), the Buyer's Premium (defined herein) and the Additional Deposit;

I, as Purchaser, hereby and irrevocably waive any and all rights, claims and interest in and to the Deposit of $2,730,000, the Buyer's Premium of $1,092,000 and the Additional Deposit of $2,730,000 (collectively the "Funds") and agree and acknowledge that the Funds are property of the bankruptcy estate of 41-23 Haight Street Realty Inc. [*i.e.*, Debtor] and the Trustee may distribute and use such Funds as the Trustee deems appropriate . . . .

(R. 155–56 (formatting in original).)

Appellant Ko avers that she received the Acknowledgement from Choi at 4:30 p.m. on June 10, 2020.  (R. 201; *see also* Brief of Appellant Mei Yang Ko ("Appellant Br."), Dkt. 5, at 8.) Upon receiving the Acknowledgment, Appellant immediately went to her grandson, Louis Yeung, who had agreed to fund the Additional Deposit.  (R. 201.)  At approximately 4:35 p.m., Yeung called his bank, Ocean First Bank, which was open until 5:00 p.m., but was informed that the wiring hours of the bank had ended at 4:00 p.m.  (R. 205.)  Thus, Appellant failed to pay the Additional Deposit.  (R. 202.)  At 7:28 p.m. on June 10, 2020, counsel for Appellee-Trustee emailed Appellant's counsel, "Was the wire sent today as required. [*sic*] Please advise asap," but received no response.  (*See* R. 352; *see also* R. 341.)  Instead, on June 12, 2020, Appellant Ko sent her counsel an email, which was forwarded to counsel for Appellee-Trustee, stating:

I would like you to beg the court and trustee that I have the money ready from only my resources on behalf of me.  Please see the attachment for proofs of funds.  That is all my money.  I wouldn't make the payment on Jun 10 because by the time I signed the agreement the banks were closed.  I wanted to wire the money on Jun 11 morning 10:30 [*sic*] but I got rejected.  I am ready to close the deal on July 10. Please help and I am ready to wire the funds additional 10% [*sic*] for extension of 30 days.

(R. 354.)

On the same day, Appellee-Trustee filed a letter with the Bankruptcy Court advising that Appellant Ko was in default and that the sale of the Real Property to her would not proceed.  (R. 26, 319.)  Thereafter, on June 30, 2020, Appellee-Trustee moved the Bankruptcy Court for an order authorizing Appellee-Trustee, on behalf of the Debtor's estate, to retain the Deposit and Buyer's Premium (totaling $3,822,000) "as liquidated damages," based upon the default under the Sale Terms, Stalking Horse Agreement, Stalking Horse Order (entered on May 8, 2020), Sale Confirmation Order (entered on May 19, 2020), and Acknowledgement.  (R. 29, 118–29.)

On July 7, 2020, Appellant Ko filed an objection to Appellee-Trustee's motion.  (R. 31, 200–18.)  In objecting to the motion, Ko principally argued that she had the money for the Additional Deposit and should be excused from failing to meet the June 10, 2020 deadline under the Acknowledgement because of "impossibility of performance," due to the wiring hours of her grandson's bank ending earlier than expected.  (*See* R. 214–18.)  Ko also argued, in passing, that the Acknowledgement "is very strongly worded and has a hint of a contract of adhesion."  (R. 217.)

On July 13, 2020, Appellee-Trustee responded to Appellant Ko's objection (R. 337–55), arguing that an impossibility defense was inapplicable and lacked merit, and any purported impossibility "was self-created by Ko, was foreseeable, and was purely financial" (R. 339).

The Bankruptcy Court held hearings on July 14, 17, and 20, 2020.  (R. 34–36.)  At the hearing on July 20, 2020, the Bankruptcy Court granted Appellee-Trustee's motion—ruling that Appellee-Trustee, on behalf of the Debtor's estate, could retain the $3,822,000 in funds "because there was a clear default" under the Stalking Horse Order and Sale Confirmation Order.  (R. 447–52.)

The Bankruptcy Court also overruled Appellant Ko's objection.  To start, the Bankruptcy Court noted that the Sale Terms and the Sale Confirmation Order gave the Trustee "sole discretion" to grant an extension of the closing date and that in this case the Trustee was willing to give Ko an extension only under certain conditions, which "Ko failed to meet."  (R. 453.)  The Bankruptcy Court therefore found the issue of impossibility to be irrelevant to the issue of whether Appellee-Trustee could retain the Deposit and Buyer's Premium.  (*Id.*)  Nevertheless, the Bankruptcy Court proceeded to reject Ko's impossibility defense as meritless, finding that "Ko knew of the requirements for obtaining an extension once the Stalking Horse Order was entered" and that "Ko could have reasonably foreseen that she would be required to wire the money to the Trustee in order to get an extension of the closing date."  (R. 453–55.)  The Bankruptcy Court determined that "Ko's assertion that she did not want to wire the money until the acknowledgement was signed is not a defense," and observed that "Ko could have provided the additional deposit to be held in escrow, pending delivery [] and execution of [the] acknowledgement."  (R. 455.)  Finally, in denying an oral motion for a stay pending appeal, the Bankruptcy Court noted, in a similar vein, that "the time of when a wire is required or what could have happened, the client knew the consequences of—and the risk and obviously took that risk and it didn't work out."  (R. 465–66.)

On July 24, 2020, the Bankruptcy Court entered an order (the "Deposit Order") authorizing Appellee-Trustee to retain the Deposit and Buyer's Premium of $3,822,000.  (R. 37, 497–99.)  Appellant Ko timely filed a Notice of Appeal with respect to the Deposit Order on August 4, 2020.[3]  (R. 544–45; *see also* Dkt. 1, at 1–2.)

---

[3]  Appellant Ko points out that following the filing of the Notice of Appeal, Appellee-Trustee sold the Real Property for $28,100,000 plus a 4% Buyer's Premium of $1,124,000.  This sale closed on September 14, 2020.  (Appellant Br., Dkt. 5, at 13; *see also* Dkt. 5-4, at ECF 7–18.)  Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

8

**DISCUSSION**

I.     **Standard of Review**

"District courts have appellate jurisdiction over 'final judgments, orders, and decrees' entered in bankruptcy court." *Satti v. Nechadim Corp.*, No. 17-CV-683 (MKB), 2018 WL 1010206, at *3 (E.D.N.Y. Feb. 16, 2018) (quoting 28 U.S.C. § 158(a)). A bankruptcy court's order is final "if it 'completely resolve[s] all of the issues pertaining to a discrete claim, including issues as to the proper relief.'" *Pegasus Agency, Inc. v. Grammatikakis* (*In re Pegasus Agency, Inc.*), 101 F.3d 882, 885 (2d Cir. 1996) (alteration in original) (quoting *Dicola v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n* (*In re Prudential Lines, Inc.*), 59 F.3d 327, 331 (2d Cir. 1995)); *see also Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 587 (2020) ("Congress made orders in bankruptcy cases immediately appealable if they finally dispose of discrete disputes within the larger bankruptcy case." (internal alterations, quotation marks, and citations omitted)).

In reviewing a decision of the bankruptcy court, the district court reviews legal conclusions *de novo*, but reviews factual findings only for clear error. *Lubow Mach. Co. v. Bayshore Wire Prods. Corp.* (*In re Bayshore Wire Prods. Corp.*), 209 F.3d 100, 103 (2d Cir. 2000). The clear-error standard means that the reviewing court does not reweigh the evidence; rather, a factual finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *See Bordonaro v. Fido's Fences, Inc.*, 565 B.R. 222, 230 (E.D.N.Y. 2017) (quoting *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 610 F.3d 44, 51 (2d Cir. 2010)). "Mixed questions of fact and law are subject to *de novo* review." *Babitt v. Vebeliunas* (*In re Vebeliunas*), 332 F.3d 85, 90 (2d Cir. 2003) (citing *FDIC v. Providence Coll.*, 115 F.3d 136, 140 (2d Cir. 1997)). When a bankruptcy court's decision is based on an exercise of its equitable authority, that decision is reviewed only for abuse of discretion. *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 607 (2d

9

Cir. 2007) (citations omitted).  "A bankruptcy court abuses its discretion if its decision rests on an error of law or a clearly erroneous factual finding or cannot be located within the range of permissible decisions." *Wilk Auslander LLP v. Murray* (*In re Murray*), 900 F.3d 53, 59 (2d Cir. 2018) (citing *Schwartz v. Geltzer* (*In re Smith*), 507 F.3d 64, 73 (2d Cir. 2007)).

Finally, this Court "may affirm on any ground that finds support in the record." *Barclays Cap. Inc. v. Giddens* (*In re Lehman Bros. Holdings Inc.*), 761 F.3d 303, 308 (2d Cir. 2014) (citing *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)); *see also Holzer v. Barnard*, 582 B.R. 37, 42 (E.D.N.Y. 2018) ("[T]he Court may affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below." (citations omitted)).

## II.   Analysis

Appellant Ko purports to raise 11 "issues" before the Court on appeal:

1.  Did the Bankruptcy Judge err in calling a default under the sale order when Ko was entitled to an extension once the Trustee agreed to the terms of an extension?

2.  Did the Bankruptcy Judge err in determining that the change in wiring hours of Ocean Bank unbeknownst to Ko and to her grandson Louis Yeung, did not create an impossibility of performance?

3.  Did the Bankruptcy Judge err in stating that Ko could have wired the money before receiving the extension agreement?

4.  Did the Bankruptcy Judge err in not recognizing that Ko was ready to wire the additional deposit at 10:30 a.m. on June 11, 2020, but that the Trustee told Ko's attorney that the Trustee would reject any such wire . . . ?

5.  Did the Bankruptcy Judge err in her application of *In re Burrier*, 399 B.R. 258 (Bankr. D. Col., 2008) with regard to her statement that "the occurrence is reasonably foreseeable" as related to the wiring of the money in general, as opposed to the specific bank hours that were the "occurrence" and that such change in hours could not be reasonably foreseen?

6.  Did the Bankruptcy Judge err in failing to apply the test set forth in the case of *The Opera Company of Boston, Inc. v. Wolf Trapp Foundation*, 817 F.2d 1094, 1102 (4th Cir., 1987) that impossibility of performance is extant when "(1) the

unexpected occurrence of an intervening act[,] (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the parties, and (3) that occurrence made performance impractical"?

7. Did the Bankruptcy Judge err in failing to apply the test set forth in *Florida Power and Light Company v. Westinghouse Electric Corporation*, 826 F.2d 239, 263–264 (4th Cir., 1987) that impossibility of performance rests firmly on the unfairness and unreasonableness of giving the contract the absolute force which its words clearly state "when such application will produce an inequitable result," with respect to the extension agreement?

8. Did the Bankruptcy Judge err in failing to address the issue that the extension agreement was a contract of adhesion in that the wording was so one-sided in favor of the Trustee as to be non-negotiable?

9. Did the Bankruptcy Judge err in failing to address the issue that the extension agreement was not sent by counsel for the Chapter 11 Trustee to counsel for Ko in its final form until 3:39 p.m. on June 10, 2020 which contributed to the impossibility of performance with respect to the wire transfer through Ocean First Bank?

10. Did the Bankruptcy Judge err in treating the forfeiture of the Deposit and Buyer's Premium as liquidated damages instead of a penalty[?]

11. Did the Bankruptcy Judge err in treating the default under the extension agreement as liquidated damages without taking into account the equities created by the coronavirus that caused Ocean First Bank to change its wiring hours?

(Appellant Br., Dkt. 5, at 2–5 (formatting in original).)[4]

These 11 questions essentially collapse into three issues: (i) whether the Bankruptcy Court erred in concluding that impossibility of performance did not excuse Appellant Ko's default under the Stalking Horse Agreement, Stalking Horse Order, Sale Confirmation Order, and

---

[4] These 11 "issues" are taken verbatim from Appellant Ko's opening brief. (Appellant Br., Dkt. 5, at 2–5.) Even though some of these "issues"—*e.g.*, Issue 3 and 11—are plainly not legal questions, Appellant Ko contends that all 11 questions should be reviewed *de novo*. (*See id.* at 2.) In any event, as discussed, these questions essentially collapse into three issues, each of which the Court reviews *de novo* and rejects as a basis for reversing the Bankruptcy Court. The Court further notes that Ko did not specifically raise all 11 questions before the Bankruptcy Court, but, again, because the Court finds that these questions collapse into three issues, all of which were raised below, the Court does not decide any of them on the basis of waiver.

Acknowledgement (Issues 1, 2, 3, 4, 5, 6, 7, 9, and 11); (ii) whether the Acknowledgement was a contract of adhesion (Issue 8); and (iii) whether the pertinent "forfeiture" provisions are unenforceable penalties (Issue 10).  The Court addresses each of these issues in turn.

### A.      Appellant's Impossibility Defense Is Misplaced and Meritless

As an initial matter, the Bankruptcy Court correctly determined that Appellant Ko defaulted under the terms of the Stalking Horse Agreement and attached Sale Terms, the Stalking Horse Order, and the Sale Confirmation Order.  (*See* R. 447–52.)  The Sale Terms—which were attached to the Stalking Horse Agreement, and in turn attached to the Bankruptcy Court's Stalking Horse Order—provides that a purchaser "must close title to the Real Property at a date that is no more than thirty (30) days after the Sale Date," unless the Trustee "in his sole discretion" extends the Closing Date by 30 days, and "**the failure of [a purchaser] to close for any reason whatsoever . . . including its failure to pay the balance of the Purchase Price on the Closing Date, will result in immediate forfeiture of the Deposit and Buyer's Premium**."  (R. 103–04 (formatting in original).)  The Sale Confirmation Order entered on May 19, 2020, similarly provides:

> The Stalking Horse Bidder [*i.e.*, Appellant Ko] shall close title to the Real Property no later than June 11, 2020 (which is no more than thirty (30) days after the date of the Public Auction) (the "Closing Date"), **TIME BEING OF THE ESSENCE**, although such Closing Date may be extended by the Trustee [*i.e.*, Appellee], in his sole discretion and after consultation with the Lender, but such extension of the Closing Date shall not be later than thirty (30) days from the original Closing Date—July 11, 2020, **TIME BEING OF THE ESSENCE**.

> To the extent that the Trustee, in his sole discretion, grants any such extension of the Closing Date, the Purchaser shall provide to the Trustee an additional, non-refundable deposit equal to ten (10%) percent of the Purchase Price in the amount of $2,730,000 (the "Additional Deposit").  The Additional Deposit shall be made by certified check or bank check made payable to "Gregory M. Messer, Chapter 11 Trustee" or by wire in immediately available federal funds.

> The Stalking Horse Bidder shall pay the Additional Deposit, and any other adjustments, as of the original Closing Date, and failure to do so shall be deemed a

default under the terms of the Stalking Horse Agreement and the Sale Terms and shall result in the Stalking Horse Bidder's automatic forfeiture of any rights whatsoever to the Deposit, the Additional Deposit and the Buyer's Premium.

(R. 150–51 (formatting in original).)

On June 9, 2020, two days before the Closing Date, Appellee-Trustee, in his discretion, granted a 30-day extension, conditioned on Appellant Ko's execution of the Acknowledgement and payment of the Additional Deposit of $2,730,000 by June 10, 2020.  (R. 201, 340.)  Appellant Ko undisputedly failed to remit the Additional Deposit by June 10, 2020.  (R. 202; *see also* Appellant Br., Dkt. 5, at 9.)  "Under New York law, the failure to satisfy a condition precedent 'excuses performance by the other party whose performance is so conditioned.'"  *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 22 (2d Cir. 2018) (quoting *Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081–82 (N.Y. 1984)).  Accordingly, the Bankruptcy Court correctly observed that "the Trustee ultimately did not grant an extension of the closing date and the closing did not occur on June 11, 2020."  (R. 451.)  Appellant Ko therefore defaulted under the plain terms of the Stalking Horse Agreement and the orders of the Bankruptcy Court.

Appellant Ko argues that her default should be excused because the condition requiring payment of the Additional Deposit by June 10, 2020, was "impossible" to perform given that the wiring hours of her grandson's bank ended earlier than expected.  This argument is misplaced.  As the Second Circuit has explained, "it is generally true that if a condition precedent to a party's duty to perform does not occur, . . . *the party will be excused* from further performance under the contract *even when the nonoccurrence [of the condition] is itself excused as the result of impossibility or impracticability*."  *Utica*, 906 F.3d at 22 (alterations in original) (quoting 14 Williston on Contracts § 43:14, at 673–74 (Richard A. Lord ed., 2013)).  In other words, Appellee-Trustee had no obligation to extend the Closing Date when Appellant Ko failed to make the

required Additional Deposit on June 10, 2020, *even if* making that Additional Deposit was *impossible* for Appellant Ko.  *See id.* ("[T]he party whose obligation to perform depends on the prior occurrence of a stated condition need not perform if the condition is not met—even if the condition is impossible to satisfy.")

There are two exceptions to this general rule, but neither applies here.  First, "[a] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."  *Id.* at 23 (quoting *MHR Cap. Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 48 (N.Y. 2009)).  Nothing in the record indicates that Appellee-Trustee "frustrated or prevented" Appellant Ko from making the required payment on June 10, 2020.[5]  Second, an exception applies "where 'the condition is of only minor importance, its happening is a mere technicality, and a forfeiture will result by insisting on its occurrence.'" *Id.* (quoting 14 Williston on Contracts § 43:14, at 674).  Here, the condition that Appellant remit payment of the Additional Deposit by June 10, 2020 is neither of minor importance nor a mere technicality.  Rather, the Bankruptcy Court's Sale Confirmation Order, among other documents, expressly states that "[t]he Stalking Horse Bidder [*i.e.*, Appellant Ko] shall close title to the Real Property no later than June 11, 2020," and that "[t]o the extent that the Trustee, in his sole

---

[5]  Appellant Ko's suggestion that Appellee-Trustee "contributed to the impossibility of performance" by not sending the finalized Acknowledgement until the afternoon of June 10, 2020 is wholly beside the point.  (*See* Appellant Br., Dkt. 5, at 32; *see also* Appellant's Reply Brief ("Appellant Reply"), Dkt. 9, at 3.)   The condition requiring Appellant to execute the Acknowledgement is distinct from the condition requiring payment of the Additional Deposit by June 10, 2020.  (*See* R. 201, 340 (showing that Ko was required to: (i) execute the Acknowledgement; *and* (ii) deliver an Additional Deposit of $2,730,000, via wire transfer, by June 10, 2020).)  There is nothing in the record indicating that the Acknowledgement had to be executed before the wiring of the Additional Deposit.  Even to the extent Ko decided on her own to wait until after the Acknowledgement was executed to wire the Additional Deposit, there is nothing in the record to suggest that Appellee did anything to delay the negotiation or execution of the Acknowledgement.

discretion, grants any such extension of the Closing Date, [Appellant Ko] shall provide to the Trustee an additional, non-refundable deposit equal to ten (10%) percent of the Purchase Price in the amount of $2,730,000 (the 'Additional Deposit')."  (R. 150.)  In other words, payment of the Additional Deposit was a central condition of the Appellee-Trustee's exercise of his discretion to extend the Closing Date.  Accordingly, whether performance of that condition was impossible, as a matter of law, is irrelevant in this case.  *See Utica*, 906 F.3d at 22–23.

In any event, Appellant Ko's impossibility defense is meritless.  "Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible."  *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987); *accord Warner v. Kaplan*, 71 A.D.3d 1, 5 (N.Y. App. Div. 2009).  Impossibility, moreover, "must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."  *Chase Manhattan Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 52 F. App'x 528, 530 (2d Cir. 2002) (summary order) (quoting *Kel Kim*, 519 N.E.2d at 296).

Payment of the Additional Deposit in this case was neither objectively impossible nor frustrated by an unanticipated event that could not have been reasonably foreseen.  The requirement of a 10% Additional Deposit was no mystery.  It was disclosed in the Sale Terms annexed to the Stalking Horse Agreement (R. 89), which in turn was attached to the Stalking Horse Order (R. 103), and it was reiterated in the Sale Confirmation Order (R. 150–51)  That Appellant Ko decided to wait until two days before the Closing Date to seek an extension, and then waited further to initiate the wire transfer process, does not make performance objectively impossible.  In fact, it was reasonably foreseeable that payment of the Additional Deposit would have to be made

15

prior to the Closing Date—*i.e.*, prior to June 11, 2020—even if the Acknowledgement had not explicitly set a deadline of June 10, 2020.

Appellant Ko's argument that she did not know the bank's hours for wire transfers ended at 4:00 p.m. instead of 5:00 p.m. is unavailing.  (*See* Appellant Br., Dkt. 5, at 27.)  Appellant Ko did not suddenly become aware of the need to make the Additional Deposit at 4:00 p.m. on June 10, 2020.  She admittedly "had previously spoken to [her] grandson," who "agreed to fund the additional 10% payment."  (R. 201.)  Moreover, the Court rejects the contention that it was not reasonably foreseeable that the bank's wiring hours would be different from its operating hours, particularly in light of the COVID-19 pandemic.[6]  (*See* Appellant Br., Dkt. 5, at 20, 25, 27–28, 33, 39–41.)   Indeed, the banking records that Appellant Ko provided to the Bankruptcy Court, which show multiple wire transfers in June 2020, including some on June 10, belie the notion that the bank's wiring hours were unforeseeable, particularly to Appellant Ko and her grandson.  (*See* R. 211–13.)

The Court also rejects the argument that payment of the Additional Deposit was impossible because Appellant Ko had to wait to receive the Acknowledgement, which was not sent until the

---

[6]  Appellant Ko argues that the Bankruptcy Court erred in failing to account for the effect of the pandemic on bank wiring procedures.  (Appellant Br., Dkt. 5, at 39–41.)  Both the record and Appellant's brief disproves this argument.  (*See* R. 641 ("[Y]ou can't assume during this pandemic that wires are even going out timely."); Appellant Br., Dkt. 5, at 40 ("The Bankruptcy Judge herself recognized the effect of the pandemic.").)  Regardless, consideration of the pandemic cuts against Appellant.  In June 2020, three months into the pandemic, someone living in New York City—especially one prepared to spend $27.3 million purchasing property—reasonably should have foreseen possible problems with bank wiring facilities and planned accordingly.  Moreover, to the extent that Appellant Ko argues generally that the Bankruptcy Court failed to consider the equities (*see* Appellant Reply, Dkt. 9, at 7–9), this allegation is belied by the record.  (*See* R. 464 (considering the equities and concluding that "the Trustee is entitled to retain the entire deposit").)  In any event, given the facts and circumstances of this case, the Bankruptcy Court's decision to allow Appellee-Trustee to retain the Deposit and Buyer's Premium was well within the range of permissible decisions, and thus not an abuse of discretion.  *See Murray*, 900 F.3d at 59.

16

afternoon of June 10.  (*See* Appellant Br., Dkt. 5, at 19–20, 32–34.)  As discussed, *see* note 5, *supra*, execution of the Acknowledgement was a separate requirement from payment of the Additional Deposit.  (*See* R. 201, 340.)  And even if the Acknowledgement was an added "wrinkle" (Appellant Br., Dkt. 5, at 8), the Additional Deposit—consistently disclosed in the relevant agreements and orders of the Bankruptcy Court (*see, e.g.*, R. 89, 103, 150–51)—was not.  That Appellant Ko decided to take the risk and wait for the Acknowledgment to be executed before attempting to initiate a wire transfer of the Additional Deposit does not render performance of the Additional Deposit impossible.  Further, that Appellant Ko was "ready, willing and able" to wire the Additional Deposit at 10:30 a.m. on June 11, 2020, is beside the point; if anything, it further belies any argument that payment of the Additional Deposit by the agreed-upon deadline of June 10 was objectively impossible.[7]

Finally, the out-of-circuit cases on which Appellant Ko relies are all inapposite.  (*See* Appellant Br., Dkt. 5, at 24–30.)  In *Opera Company of Boston, Inc. v. Wolf Trap Foundation for Performing Arts*, the Fourth Circuit enumerated a three-part test for the defense of impossibility: "(1) the unexpected occurrence of an intervening act, (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties, and (3) that

---

[7] Appellant Ko argues that Appellee-Trustee made "a *post-facto* amendment" of the June 10, 2020 deadline in his July 13, 2020 Reply to Appellant's objection below, by purportedly indicating a "willingness to accept the Additional Deposit if it had been made on the morning of June 11, 2020."  (*See* Appellant Br., Dkt. 5, at 21; *see also* R. 337–343.)  In other words, Appellant Ko suggests that Appellee-Trustee's Reply filed on July 13, 2020, "in effect amended the Acknowledgement with respect to the timing of the wiring of the Additional Deposit."  (Appellant Br., Dkt. 5, at 23.)  This argument is frivolous and nonsensical.  Appellee-Trustee's Reply merely observes: (1) that Appellant's counsel did not respond "either on June 10, 2020 or on June 11, 2020" to Appellee-Trustee's June 10, 2020 email inquiring whether the wire had been sent; and (2) that "[e]ven if there was some merit to Ko's claim about an inability to make the wire transfer, she failed to initiate the wire the following day."  (R. 341–42.)  These observations do not constitute "a *post-facto* amendment" of the June 10, 2020 deadline.

occurrence made performance impracticable."  817 F.2d 1094, 1102 (4th Cir. 1987).  Applying

this standard to the "unexpected occurrence" at issue in that case—a severe thunderstorm that

caused a power outage and resulted in the cancellation of an outdoor performance, *id.* at 1096—

the Fourth Circuit determined that a remand to the trial court was necessary for additional

factfinding as to whether the power failure "was of that degree of reasonable likelihood as to make

[a defense of impossibility] improper," *id.* at 1103.  The "unexpected occurrence" here, however,

was not a power failure as a result of a severe thunderstorm; it was Appellant Ko's own delay in

initiating a wire transfer and her inability to do so based on her mistaken belief about the bank's

wiring hours ending at 5:00 p.m. instead of 4:00 p.m.  (*See* R. 202; *see also* Appellant Br., Dkt. 5,

at 27.)  The two are incomparable.  If nothing else, Ko plainly cannot demonstrate an element of

the three-part test the Fourth Circuit applied in *Opera Company*.  The availability of the bank's

wiring services until 5:00 p.m. was not "of such a character that its non-occurrence was a basic

assumption of the agreement of the parties."  *See* 817 F.2d at 1102.

In *Florida Power & Light Co. v. Westinghouse Electric Corp.*, the Fourth Circuit

confronted a case where a change in government policy regarding the disposal of spent nuclear

fuel allegedly rendered performance of a contract impossible.  826 F.2d 239, 241–43, 272–73 (4th

Cir. 1987).  Applying its standard articulated in *Opera Company*, the Fourth Circuit determined

that the defense of impossibility was established.  *Id.* at 264–78.  By contrast, there is nothing in

this case to indicate a sudden change in policy occurred.  Although Appellant Ko asserts that the

bank changed its wiring hours (*e.g.*, Appellant Br., Dkt. 5, at 20, 25, 27, 33), this assertion is

unsupported by the record.  Appellant Ko simply averred to the Bankruptcy Court that when

Yeung, her grandson, called the bank, "he was told that the wiring hours were from 8:30 a.m. to

4:00 p.m., notwithstanding that the bank itself is open until 5:00 p.m."  (R. 202; *see also* R. 214–

15 ("[T]he transfer could not be made on June 10, 2020 because the bank's wiring hours terminated at 4:00 p.m. when Yeung believed that he had until 5:00 p.m.[,] which was the normal closing hour of the bank.").)  Yeung's mere *belief* that the bank's wiring hours were coterminous with its operating hours does not establish what the bank's normal policy or practice was, and thus Ko fails to demonstrate a change, sudden or otherwise, in the bank's wiring hours.  More fundamentally, as already discussed, it should have come as no surprise to Ko that the Additional Deposit— consistently disclosed in the Stalking Horse Agreement, Stalking Horse Order, and Sale Confirmation Order—needed to be remitted before the Closing Date.  (*See, e.g.*, R. 89, 103, 150–51.)

Last, in *In re Burrier*, the Bankruptcy Court for the District of Colorado concluded that an impossibility defense was apt because it found that certain documents necessary to satisfy the terms of the parties' stipulation were not only unavailable but possibly did not exist, and the risk that such documents would be unavailable could not reasonably have been foreseen at the time the parties entered the stipulation.  399 B.R. 258, 265–66 (Bankr. D. Colo. 2008), *vacated on other grounds*, 403 B.R. 714 (Bankr. D. Colo. 2009).  Here, wiring facilities were neither nonexistent nor categorically unavailable at the time Ko sought, and Appellee-Trustee agreed to, an extension, provided that the Additional Deposit was paid by June 10, 2021.  Wiring facilities simply were not available at the precise moment Appellant chose to initiate a transfer.

In short, Appellant Ko fails to demonstrate that payment of the Additional Deposit was objectively impossible or frustrated by an unforeseeable event.  *See Kel Kim*, 519 N.E.2d at 296; *Traffic Stream*, 52 F. App'x at 530.  The Court concludes, under *de novo* review, that an impossibility defense is inapposite, and in any event entirely meritless.

19

**B.      Appellant's Argument that the Acknowledgement Was a Contract of
          Adhesion Is Inapposite**

A contract of adhesion "is a contract formed as a product of a gross inequality of bargaining power between parties." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (citation omitted). "A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used high pressure tactics, or deceptive language, or that the contract is unconscionable." *Id.* (citation omitted).

There is no evidence of deceptive language, high-pressure tactics, or unconscionability with respect to the Acknowledgement. Appellant Ko characterizes the Acknowledgement as a "take it or leave it" situation and describes the requirement that the Additional Deposit be remitted on the same day as "onerous." (Appellant Br., Dkt. 5, at 30–31.) But it was Appellant Ko who waited until two days before the Closing Date to request an extension of the Closing Date from Appellee-Trustee. Additionally, the terms of the Acknowledgement certainly were not deceptive and could not have come as a surprise to Ko since they were consistent with the terms of the Stalking Horse Agreement, Sale Terms, and Sale Confirmation Order. (*Compare* R. 155–56, *with* R. 58–59, 89–90, 103–04, 150–52.) Appellant Ko also had clear notice that the Closing Date was June 11, 2020, and that any extension of the Closing Date was committed to the "sole discretion" of Appellee-Trustee. (*See* R. 150; *see also* R. 89, 103.) In other words, Appellee-Trustee had no obligation to extend the Closing Date at Appellant Ko's behest, and Ko had no right to demand an extension or expect one to be granted. Lastly, there can be no argument that the terms of the Acknowledgement were "unconscionable"; the requirement of the Additional Deposit given Ko's inability to meet the 30-day deadline to close on the sale was reasonable. Thus, there is no basis to conclude that the Acknowledgement was a contract of adhesion.

**C.      The Deposit-Forfeiture Provisions Are Not Unenforceable Penalties**

Appellant Ko argues that the deposit-forfeiture provisions in the Stalking Horse Agreement, Stalking Horse Order, and Sale Confirmation Order that purport to allow Appellee-Trustee to retain the Deposit and Buyer's Premium are unenforceable. (*See* Appellant Br., Dkt. 5, at 34–39; *see also* Appellant Reply, Dkt. 9, at 4–7.)  As an initial matter, the terms of these agreements and orders are not properly before this Court for review.  As the Second Circuit has repeatedly recognized, "appellate jurisdiction over an *unstayed* sale order issued by a bankruptcy court is statutorily limited to the narrow issue of whether the property was sold to a good faith purchaser." *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 105 F.3d 837, 839 (2d Cir. 1997) ("*Gucci I*") (citing 11 U.S.C. § 363(m); *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991)); *accord Contrarian Funds LLC v. Aretex LLC* (*In re WestPoint Stevens, Inc.*), 600 F.3d 231, 247 (2d Cir. 2010); *Kabro Assocs. v. Colony Hill Assocs.* (*In re Colony Hill Assocs.*), 111 F.3d 269, 272 (2d Cir. 1997).  In other words, "regardless of the merit of an appellant's challenge to a sale order, [an appellate court] may neither reverse *nor modify* the judicially-authorized sale if the entity that purchased or leased the property did so in good faith and if no stay was granted." *Gucci I*, 105 F.3d at 840 (emphasis added).  Such a rule "furthers the policy of finality in bankruptcy sales and assists the bankruptcy court to secure the best price for the debtor's assets." *Id.* (citing *Salerno*, 932 F.2d at 123); *accord Colony Hill*, 111 F.3d at 272.  Appellant Ko did not seek a stay of either the Stalking Horse Order or the Sale Confirmation Order before the Bankruptcy Court, and thus, this Court has no authority to modify the terms of those orders.

In any event, Appellant Ko's argument fails on the merits.  "Courts repeatedly emphasize the importance of enforcing the finality of bankruptcy sales," and "[w]ith respect to buyers at such sales who fail to complete their purchase of real property, courts pursue this policy of finality by strict enforcement of the terms of sale against the buyer." *In re Target Two Assocs., L.P.*, No. 04-

CV-8657 (SAS), 2006 WL 3068668, at *6 (S.D.N.Y. Oct. 27, 2006) (citations omitted), *aff'd*, 282 F. App'x 914 (2d Cir. 2008); *see also Raj v. Barnard* (*In re Joe's Friendly Serv. & Son, Inc.*), 538 B.R. 618, 626 (E.D.N.Y. 2015) ("Appellant knowingly received, reviewed, and signed the court-approved Terms of Sale, thereby contractually obligating himself to comply with the Terms, for the specific purpose of becoming eligible to participate in the auction. Those Terms of Sale are thus dispositive here."); *In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 345 (Bankr. E.D.N.Y. 1993) ("The Trustee is authorized to retain the deposit of [the defaulting purchaser] in the amount of $250,000 as liquidated damages."), *aff'd*, 196 B.R. 251 (E.D.N.Y. 1996). Although "courts have recognized that equitable considerations might lead to a different result in extraordinary cases," *Target Two*, 2006 WL 3068668, at *6 (citation omitted), the Bankruptcy Court was well within its discretion to conclude that no such factors exist here (*see* R. 464). Despite Appellant Ko's insistence that she "tried to keep the deal going" (Appellant Reply, Dkt. 9, at 5), the fact of the matter is that she unquestionably defaulted, with full notice of the consequences of such a default.

Appellant Ko's argument that Appellee-Trustee has been unjustly enriched is similarly unavailing. Under New York law, there is unjust enrichment if "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (N.Y. App. Div. 2002)); *accord Kaplan v. Reed Smith LLP*, 919 F.3d 154, 160 (2d Cir. 2019) (per curiam). Here, the third element is lacking. Appellant Ko makes much of the fact that the Real Property ended up being sold for $28,100,000—$800,000 above the Purchase Price of $27,300,000 under the Stalking Horse Agreement—plus a new buyer's premium of $1,124,000. (*See* Appellant Br., Dkt. 5, at 13, 37; Appellant Reply, Dkt. 9, at 5.) She argues that allowing Appellee-Trustee to retain the Deposit

22

and Buyer's Premium here,[8] along with the additional buyer's premium paid in the eventual sale of the Real Property, would constitute an improper "windfall."  (*See* Appellant Br., Dkt. 5, at 37–38; Appellant Reply, Dkt. 9, at 5–6.)  But in the context of bankruptcy sales, given the importance of finality, courts have determined that defaulting purchasers, not the trustee of a debtor's estate, should bear the risk of fluctuating market conditions and defaults.  *Cf. Balaber-Strauss v. Markowitz (In re Frankel)*, 191 B.R. 564, 573–74 (Bankr. S.D.N.Y 1995) (requiring specific performance because "the risk" of "different" market conditions "should be borne by the defaulting purchaser," and also because the trustee should not be required "to suffer the nuisance, cost and delay attendant upon yet another auction of the property, particularly when one considers that any prospective purchaser might engage in the same tactics of delay and ultimate breach"); *Maxton Builders, Inc. v. Galbo*, 502 N.E.2d 184, 189 (N.Y. 1986) (noting that if a real-estate sale agreement "expressly" allows the seller to retain a down payment in the event of the buyer's default, "the provision would probably be upheld as a valid liquidated damages clause in view of the recognized difficulty of estimating actual damages and the general acceptance of the traditional 10% down payment as a reasonable amount").  Accordingly, deposit-forfeiture provisions are not unenforceable simply because the property or asset later is sold for a higher price.  In fact, as the court in *Target Two* recognized, deposits in these types of cases, far from being penalties, are like purchasing an option, which can have value.  *See* 2006 WL 3068668, at *6.

In sum, the Bankruptcy Court did not err, and equity and good conscience militate against disturbing the Bankruptcy Court's order.

---

[8]  The Deposit and Buyer's Premium here, totaling $3,822,000, is 14% of the Purchase Price of $27,300,000.

## CONCLUSION

The order of the Bankruptcy Court allowing Appellee-Trustee to retain funds of $3,822,000 over Appellant Ko's objection is affirmed.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: September 29, 2021
Brooklyn, New York

24